1    UNITED STATES DISTRICT COURT
2    DISTRICT OF PUERTO RICO

3    JORGE FRANCISCO SÁNCHEZ, et al.,

4        Plaintiffs,
                                                    Civil No. 08-2151 (JAF)
5        v.

6    ESSO STANDARD OIL DE PUERTO
7    RICO, INC.,

8        Defendant.

9    **FINDINGS OF FACT, CONCLUSIONS OF LAW,**
10   **AND ORDER**

11       Plaintiffs, Jorge Francisco Sánchez ("Sánchez") and Dolores Service Station and Auto

12   Parts, Inc., former operators of a service station under the Esso flag, bring this citizen suit

13   against Defendant, Esso Standard Oil de Puerto Rico, Inc. ("Esso"), seeking injunctive relief

14   and the imposition of civil penalties for alleged violations of the Resource Conservation and

15   Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k, and federal and Commonwealth

16   regulations governing notification and corrective action requirements for releases from

17   underground storage tanks ("USTs").  (Docket No. 1.)[1]  Plaintiffs alleged that releases of

18   petroleum product from three USTs, formerly owned by Esso, caused the contamination of soil

19   and groundwater at and near the property where they operated their service station.  (Id.)

---

[1] Unless otherwise noted, all docket and Exibit citations refer to Civil No. 08-2151.

Civil No. 08-2151 (JAF)                                                              -2-

1        Esso asserts counterclaims for reimbursement under the federal Comprehensive

2    Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a),

3    against Plaintiffs. (Docket No. 301 at 11–13.)  Esso brings an identical third-party claim under

4    § 9607(a) of CERCLA against Jorge Luis Sánchez-Sánchez and Alicia Solano-Díaz ("the

5    Sánchez Parents") as well as current property owners Ángel Manuel Sánchez-Gómez and

6    Héctor Benito Sánchez-Gómez ("Property Owners") (collectively "Third-Party Defendants").

7    (Id. at 13–16.)

8        Additionally, Esso has raised an indemnification counterclaim against Sánchez under

9    Puerto Rico law based on provisions in various contracts whereby Esso supplied fuel for the

10   operation of the service station.  (Id. At 11–12.)   Esso asserts identical third-party

11   indemnification claims against the Sánchez Parents, who joined Sánchez as signatories to the

12   relevant contracts with Esso.  (Id. at 13–14.)

13       On August 5, 2010, we denied Esso's motions for summary judgment on various claims

14   (Docket No. 425),[2] and we proceeded to a bench trial held from August 16 to August 19, 2010.

15   The following sets forth the pertinent procedural background, as well as this court's findings of

16   fact.  See Fed. R. Civ. P. 52.

———————————————

        [2]We also declined supplemental jurisdiction over Property Owners' counterclaims in nuisance
and tort under Puerto Rico law, brought against Esso roughly nineteen months after the suit began.
(Docket No. 425 at 7–8.)

1                                          **I.**

2                        **Factual and Procedural Background**

3          Property Owners own a 0.77-acre parcel of property located at Km. 14 of northbound

4    highway PR-3 in the Canovanillas Ward of the Municipality of Carolina, Puerto Rico, situated

5    approximately thirty-five feet above sea level, around 3,300 feet from the Río Grande de Loíza

6    waterway.  (Docket No. 460 at 185.)  The property has been used as a gasoline-dispensing

7    service station since the early 1960s.  (Docket No. 22 at 1–2.)

8          In 1985, Esso replaced Shell Oil as the gasoline and diesel supplier for Dolores service

9    station by executing the pertinent contracts with the Sánchez Parents. (Def. Exs. 3; 4.) Around

10   that time, Esso replaced two of the three existing USTs at the service station.  (Id.)

11         Once the original contractual agreements between Esso and the Sánchez Parents expired,

12   Sánchez joined his parents as a signatory on new contracts formed in June 1992.[3]  (Def. Exs. 7;

13   8.)  Shortly after, in August 1992, Esso removed and replaced the diesel UST located in the

14   southeast corner of the property with a 6,000-gallon capacity, double-walled, fiberglass UST.

15   (See Docket No. 24 at 42–44.)  Later, in January 1998, Esso removed and replaced the two

16   10,000-gallon capacity USTs located on the southwest corner of the property with two

17   12,000-gallon USTs, and Esso's consultant, ERTEC, prepared a report that included all available

18   technical data up to that date. (Id.)

———————————————

    [3]Dolores Service Station and Auto Parts, Inc. never signed a contract with Esso.  Nevertheless, in
January 1997, it was incorporated and started operating the service station.

Civil No. 08-2151 (JAF)                                                                  -4-

1        ERTEC's "Report on Removal of Underground Storage Tanks" ("Removal Report"),

2    dated May 5, 1998 (Dec. 3, 2008 Prelim. Inj. Hr'g, Pls' Ex. 2), was submitted to the

3    Environmental Quality Board ("EQB") on May 14, 2001.  (Dec. 3, 2008 Prelim. Inj. Hr'g,

4    Def. Ex. 9.)  Eventually, Esso received a "no further action" letter from the agency releasing it

5    from conducting any further environmental studies at the site. (Def. Ex. 21.)

6        Later that year, Esso contracted ERTEC to investigate the condition of the soil in the

7    vicinity of the diesel UST. (See December. 3, 2008 Prelim. Inj. Hr'g, Def. Ex. 2.)  Thereafter,

8    Esso continued to conduct additional investigative work through ERTEC, including the "Phase

9    II environmental evaluation,"[4] which culminated in the submission of a Corrective Action Plan

10   ("CAP") to the EQB in 2007.  (Def. Ex. 43.)  The CAP was first implemented in May 2008

11   (Dec. 3, 2008 Prelim. Inj. Hr'g, Def. Ex. 5), and the monitoring envisioned by the CAP was in

12   progress when this civil action was filed.

13       Although the UST system currently at the site had never leaked and was not leaking on

14   the date suit was filed, as Sánchez readily admitted at trial, Plaintiffs filed suit on October 6,

15   2008.[5]  After a preliminary injunction hearing was held on December 2 and 3, 2008, which we

16   discuss in more detail below, this court ordered a Comprehensive Site Assessment ("CSA") at

_____

        [4] In 2006, Esso employed ERTEC to evaluate the soil and groundwater conditions of the site,
resulting in the Phase II Environmental Evaluation ("Phase II assessment"), dated November 14, 2006.
(Def. Ex. 36.)

        [5] On October 31, 2008, Esso sold all of its equipment at the service station, including the service
station USTs at issue here.  (Docket No. 264 at 3.)

Civil No. 08-2151 (JAF)                                                                        -5-

1    the site. (Docket No. 22.)  The initial CSA report was submitted to this court in July 2009

2    (Def. Ex. 55), and the report on the final supplemental investigative work recommended in the

3    initial report was submitted in August 2010. (Def. Ex. 60.)

4                                                **II.**

5                                         **Trial Evidence**

6            In addition to the Exhibits on the record, Carlos I. Figueroa ("Figueroa"), Esso's project

7    manager, was called to testify as a witness for both parties.  Plaintiffs also called their expert,

8    Carlos M. Belgodere-Pamies, Sánchez, and Ricardo Alvarez, a member of On-Site

9    Environmental Inc. ("On-Site").[6]  In addition to Figueroa, Esso called John A. Connor and

10   Dr. Janet Kester.  While we discuss the pertinent testimony throughout this Opinion and Order,

11   we set forth in more detail the testimony of the key witnesses in this case.

12   **A.      Plaintiffs' Witness Carlos M. Belgodere-Pamies**

13           Plaintiffs' case rests entirely upon the proffered expert testimony of Carlos M.

14   Belgodere-Pamies ("Belgodere"), a geologist and self-described environmental expert.

15   Belgodere is no stranger to litigation against Esso.  In fact, he acknowledged his current

16   involvement in as many as five cases against the company.  As the First Circuit noted in an

17   unrelated Esso case involving Belgodere, he consulted for Esso in the 1980s before being

18   dismissed for incompetence.  Esso Standard Oil Co. v. Cotto, 389 F.3d 212, 216 (1st Cir. 2004),

19   aff'g. 327 F. Supp. 2d 110 (D.P.R. 2004).  He has threatened Esso executives with physical

_____

[6] On-Site served as plaintiff's technical team for purposes of CSA implementation, while Esso employed the services of ERM.  (See Pls' Ex. 7; Def. Ex. 55.)

1    violence and has suggested that he can control litigation through extortion.  Id.  This court

2    reviewed some of these threats on video (Def. Ex. 69) and can confirm the First Circuit's

3    description of his attitude and behavior.

4         Belgodere has been found to hold a "violent animus" toward Esso.  Cotto, 327 F. Supp.2d

5    at 123.  He has threatened Esso executives that he would go to their children's school to accuse

6    the executives of killing children.  Id. at 118.  In another incident, he told an Esso attorney that

7    she "didn't have the right to breathe here" and that she only had the "right to have [her] ass

8    kicked off the fucking island." (Def. Ex. 69.)  Because Belgodere denied having made these

9    statements, Esso produced, and this court reviewed, this run-in on videotape.  (Docket No. 456

10   at 4–6.)  There was no justification for Belgodere's outrageous behavior, which only confirms

11   his bias and lack of objectivity.

12        In a separate incident at another site, Belgodere physically threatened Esso engineer

13   Marla Rivera, warning her that her "life was in danger, the more impossible you make my life,

14   the more difficult I will make yours."  Id.  He also threatened that if someone came to cut her

15   up, he would look the other way.  Id.  He further told her that "I wouldn't want to deal with your

16   husband, if [drug addicts] cut up your face."  Id.  Here again, this court reviewed the incident

17   on tape and can confirm Belgodere's threatening nature and behavior.  The only explanation

18   Belgodere offered at trial was that he was actually protecting and warning, instead of

19   threatening, the Esso representatives.  We find this explanation to be wholly implausible.

1   Belgodere testified in court with the same hostile demeanor, which further evinces his inability

2   to objectively assess any data or situation involving Esso.

3        Belgodere's professional opinions and conduct are no better than his behavior.  In this

4   case, there is compelling evidence that from the beginning he has improperly interfered with and

5   influenced the work of this court-appointed environmental consultants.  In one glaring example,

6   he unjustifiably and materially changed the conclusions drawn by the On-Site team in a draft

7   of its 2009 report.  (Pls' Ex. 7; Def. Exs. 71; 72.)  He represented himself as familiar with the

8   EQB Puerto Rico Underground Storage Tank Control Regulations ("EQB UST Regulations").

9   See P.R. Admin. Reg. 4362, Rules 501, 503, 601, 602(A)–(B), 603(A), 604(A)–(B),

10  606(A)(1)(3) (1990).[7]  Yet, Belgodere continuously referred to unrelated hydraulic lift tanks as

11  USTs despite a clear exclusion for such equipment in the EQB USTR Regulations, and despite

12  his own conflicting testimony that said tanks were actually above ground.  See P.R. Admin.

13  Reg. 4362, Rule 103(B)(3).  He rendered the unsupported opinion that Esso had tried to pass

14  off responsibility for remediation at the site by selling the tanks to Plaintiffs.  Upon reviewing

15  the alleged support for this opinion, it is clear that no such effort ever occurred.  Email

16  exchanges where Belgodere "reviewed" drafts of On-Site's 2009 report reveal that he changed

17  On-Site's conclusion that the hydrocarbon-contaminated area was well defined to read that said

18  area was not well defined.  (Docket No. 460 at 144–46.)  The record is filled with other

19  examples of his unsupported, inaccurate opinions, as well as wholly-erroneous representations

_____

[7] For their federal counterparts, see 40 C.F.R. §280.50, -.52, -.60 to -.63, and -.65 (2010).

1    of the supposed factual basis for same.  Perhaps tellingly, he offered no opinions to a reasonable

2    degree of certainty in his field.

3         Esso filed a timely motion prior to trial to exclude Belgodere based on his obvious bias

4    and this court's gatekeeping function under Federal Rule of Evidence Rule 702. (Docket

5    No. 397.)  We granted Plaintiffs the opportunity to offer Belgodere's opinions, while reserving

6    our ruling on the motion.  (Docket No. 407.)

7         Faced with a proffer of expert testimony, the trial judge must determine at the outset

8    whether the reasoning or methodology underlying the testimony is scientifically valid and

9    whether the reasoning or methodology can be applied properly to the facts at issue.  See Daubert

10   v. Merrell Dow, 509 U.S. 579, 592–93 (1993).  In this instance, this court patiently permitted

11   Plaintiffs to put on their best case, which relies almost exclusively on Belgodere's testimony.

12   Even without the overwhelming evidence of  Belgodere's bias, the testimony offered does not

13   satisfy the requirements of Rule 702 and Daubert.  Instead of offering relevant testimony to

14   assist this court in exploring the findings of the site investigations, Belgodere obscured the facts

15   and offered unreliable opinions.  In addition, Belgodere has never published his opinions in a

16   peer-reviewed journal,[8] his opinions were not supported by sufficient facts or data, there are no

17   non-litigation uses for his opinions—which are, in fact, inconsistent with actual testing at the

_____

[8] His curriculum vitae indicates his last publication of any sort was in 1981.  It also includes a list of fourteen other cases in which he served as an expert, but it omits several cases involving Esso. (Pls' Ex. 1.)

1    site—and it is apparent that his opinions are exclusively geared toward a finding of liability

2    against Esso.

3          The ample evidence of Belgodere's bias further taints his testimony. This court witnessed

4    firsthand the extraordinary animus other courts have attributed to this witness. We granted the

5    Plaintiffs wide latitude in this bench trial to present whatever evidence they believed they had,

6    despite the expert witness' bias.  After listening to his lengthy testimony, we assumed the jury's

7    role as the finder of fact in gauging "the potential bias of an expert witness."  Cruz-Vazquez v.

8    Mennonite Gen. Hosp., No. 09-1758, 2010 U.S. App. LEXIS 15263, at *11 (1st Cir.  July 26,

9    2010).

10         After observing his demeanor, patiently listening to his testimony, and reviewing his

11   reports in the record, this court finds Belgodere to utterly lack credibility for any purpose.  His

12   was not a carelessly-mistaken presentation; it was a wrongful one.  Based on the conduct he has

13   Exibited in this case and on this record—including threatening Esso representatives,

14   mischaracterizing data, and improperly interfering with, and altering the work of,

15   court-appointed technical consultants—we conclude that Belgodere is not qualified to testify

16   as an expert in the field of environmental science or petroleum geology under the pertinent legal

17   standards of Daubert and Rule 702.  Even if we had deemed him qualified, his violent bias,

18   spurious testimony, and impermissible conduct rendered his testimony irrelevant and unreliable.

19         We further find that our original reliance on Belgodere at the time of the issuance of the

20   preliminary injunction, including the disqualification of ERTEC, was in error, motivated only

Civil No. 08-2151 (JAF)                                                                  -10-

1    by Belgodere's unchallenged testimony at the time of the preliminary injunction hearing.

2    Belgodere, assisted by counsel, deceived this court and took advantage of Esso's unpreparedness

3    to litigate the issues fully at that time.  For the foregoing reasons, we give no credibility to

4    Belgodere's testimony.

5    **B.     Defendant's Expert John A. Connor, P.E., P.G., B.C.E.E.**

6           John A. Connor ("Connor") is a registered professional engineer, licensed professional

7    geoscientist, and diplomate of the American Academy of Environmental Engineering.  (Def.

8    Ex. 58 at 4.)  He is president of GSI Environmental Inc., in Houston, Texas, and holds a M.S.

9    in Civil Engineering from Stanford University.  (Id.)  He has thirty years of professional

10   experience in environmental engineering, specializing in the areas of environmental site

11   investigation and remediation, human and ecological risk assessment, and corrective action

12   design.  (Id.)

13          Esso called Connor to testify as an expert on the issues of its compliance with RCRA,

14   whether any contamination at the site could pose an "imminent and substantial endangerment

15   to health or the environment" under the RCRA citizen-suit provision, 42 U.S.C. § 6972

16   (a)(1)(B), and the nature of waste characterization.

17          Connor described Plaintiffs' suggestion that any contamination from the site could travel

18   to the river as a "profound, fundamental error" in hydrogeology.  Plaintiffs' expert Belgodere

19   had either confused or conflated hydraulic conductivity with groundwater velocity.  As stated

20   by Connor in his report, this error suggests "a fundamental misunderstanding, or unsound

1    application, of widely-understood principles of groundwater flow and raises questions as to the

2    reliability of technical opinions expressed by On-Site/Belgodere." (Def. Ex. 58 at 16.)  In fact,

3    Connor testified that the benzene contamination at the site is both small in size and slow

4    moving, as it moves no more than twenty-two feet per year.   (Docket No. 460 at 185.)

5    Additionally, as Connor testified, the contamination has been dissipating in concentration,

6    precluding any threat to the aquifer or river.  (Id. at 185–86.)

7             Additionally, specific testing was conducted for an alleged spill of used oil from a

8    hydraulic lift, as Connor explained, and the testing for Oil Range Organics, also known as

9    Mineral Range Organics, detected no evidence of such a spill. (See also, Def. Ex. 36 at 17.)

10   Connor also testified as to why the presence of Diesel Range Organics ("DRO") in soil samples

11   near monitoring well MW-302 did not signal the need for further delineation of potential DRO

12   contamination.[9]  First, he testified, the risk of DRO in soil dissolving into and contaminating

13   groundwater constitutes the primary concern regarding DRO soil contamination, but the

14   non-detect results for DRO in the water taken from that well had foreclosed the possibility of

15   water contamination.  (Docket No. 460 at 202–04.)  Second, he testified, at such a depth the

16   DRO concentrations were too low to be mobile, or to spread into surrounding soil.  (Id. at 203.)

17            We denied Plaintiffs' motion to strike Connor's testimony as an expert (Docket No. 459

18   at 39), and we find his testimony credible, relevant, and persuasive.

_____

[9] "Delineation" entails identifying and mapping the spatial extent and boundaries of a
contamination plume, or a subterranean concentration of a contaminant in groundwater or soil.

1    **C.     Defendant's Expert Dr. Janet Kester, Ph.D., DABT**

2            Dr. Janet Kester ("Dr. Kester") is a Ph.D. toxicologist and an expert in evaluating human

3    health exposure and risk assessment, and has performed risk assessments under a variety of

4    regulatory regimes in the Americas and beyond.  (Def. Ex. 59 at 3.)  She is Board Certified in

5    toxicology by the American Board of Toxicology.  (Id.)  Esso offered Dr. Kester's expertise to

6    address whether "imminent and substantial endangerment to health or the environment" existed

7    under the standard found in the RCRA citizen-suit provision, 42 U.S.C. § 6972(a)(1)(B).

8            After reviewing the data from Esso's Phase II site assessment and the results of the court-

9    ordered CSA, Dr. Kester concluded: (1) there is no evidence of any pathway for human

10   exposure to petroleum constituents released from USTs or other sources at the site;

11   (2) petroleum-related compounds in the soil or groundwater are not present at levels that could

12   pose any risk of adverse health effects, even if regular exposure through some hypothetical

13   pathway occurred; and (3) there is no evidence that organic lead compounds or total lead, which

14   were either not found or found below applicable regulatory standards, pose any risk of adverse

15   health effects at this site.  (See Def. Ex. 59 at 10.)

16           We find Dr. Kester's report, opinions, and testimony to be credible and persuasive.

17   Plaintiffs offered no credible evidence to the contrary.

Civil No. 08-2151 (JAF)                                                                                   -13-

1                                                          **III.**

2                                                         **RCRA**

3              Plaintiffs brought claims under 42 U.S.C. § 6972.  This section provides, in pertinent

4       part, as follows:

5                          [A]ny person may commence a civil action on his own behalf–
6
7                          (1)(A) against any person . . . who is alleged to be in violation of
8                          any permit, standard, regulation, condition, requirement,
9                          prohibition, or order which has become effective pursuant to
10                         [RCRA]; or

11                         (1)(B) against any person . . . who has contributed to or who is
12                         contributing to the past or present handling, storage, treatment,
13                         transportation, or disposal of any solid or hazardous waste which
14                         may present an imminent and substantial endangerment to health
15                         or the environment.

16      42 U.S.C. § 6972(a)(1)(A)–(B).

17             These two subsections (respectively "§ 6972(a)(1)(A)" and "§ 6972(a)(1)(B)") allow a

18      plaintiff to pursue relief under two different scenarios.

19             Under § 6972(a)(1)(A), the court may grant relief to address only an ongoing violation

20      of RCRA.  See Sánchez v. Esso Standard Oil Co., 572 F.3d 1, 7 (1st Cir. 2009).  Plaintiffs

21      contend that Esso is in continuing violation of two different sets of RCRA regulations.  First,

22      Plaintiffs contend that Esso is in violation of numerous Puerto Rico EQB standards pertaining

23      to the investigation, reporting, and cleanup of spills of petroleum products from USTs under

Civil No. 08-2151 (JAF)                                                                    -14-

1    Subchapter IX of RCRA.[10]  Second, Plaintiffs contend that Esso is in violation of standards

2    applicable to the owners and operators of RCRA-regulated treatment, storage, and disposal

3    facilities under Subchapter III of RCRA.[11]

4           Under § 6972(a)(1)(B), the court may grant relief to address past or present regulated

5    conduct regarding waste that may give rise to an "imminent and substantial endangerment to

6    human health or the environment."  42 U.S.C. § 6972(a)(1)(B).  An imminent and substantial

7    endangerment exists only when "a reasonable prospect that a serious, near-term threat to human

8    health or the environment exists."  Me. People's Alliance & Natural Res. Def. Council v.

9    Mallinckrodt, Inc., 471 F.3d 277, 279 (1st Cir. 2006).  The "mere presence" of contaminants

10   in the environment "is alone not enough to constitute an imminent and substantial

11   endangerment."  Id. at 282.  An imminent and substantial endangerment does not exist "if the

12   risk of harm is remote in time, speculative in nature, and de minimis in degree."  Smith v.

13   Potter, 187 F. Supp. 2d 93, 98 (S.D.N.Y. 2001) (quoting Wilson v. Amoco Corp., 989 F.Supp.

14   1159, 1172 (D. Wyo. 1998)).

15   **A.     § 6972(a)(1)(A) Claim**

16          **1.     Subchapter IX**

17          Under Subchapter IX, regulating USTs, the EPA has promulgated regulations mandating

18   that owners and operators of USTs notify environmental regulators of releases from USTs,

---

[10] Subchapter IX of RCRA regulates USTs.  See 42 U.S.C. §§ 6991–6991m.

[11] It remains unclear precisely which portions of RCRA Subchapter III, Plaintiffs contend Esso is violating.

Civil No. 08-2151 (JAF)                                                    -15-

1   investigate such releases, and perform corrective action to address them.  See generally 40

2   C.F.R. § 280.  The EPA has delegated the responsibility of administering this program in Puerto

3   Rico to EQB.  See 40 C.F.R. § 282.102(a).  Pursuant to this delegation, the EQB developed and

4   enacted the EQB UST Regulations on November 7, 1990.  See Sánchez, 572 F.3d at 6–7.  The

5   EQB UST Regulations is the functional equivalent of the EPA's regulations.  Compare 40

6   C.F.R. § 280, with P.R. Admin. Reg. 4362, Rules 501–608.

7           Although at various times in this case Plaintiffs alleged violations of numerous UST

8   regulations, at trial they concentrated on three such allegations:  (1) Esso's alleged failure to

9   report and to clean up an alleged spill of hydraulic oil from the above-ground reservoir tank and

10  lines attached to a truck lift on the west side of the facility under EQB UST Regulation 504 ;

11  (2) Esso's alleged failure to "fully delineate" under EQB UST Regulation 606 the identified

12  benzene groundwater contamination and Total Petroleum Hydrocarbon ("TPH") soil

13  contamination identified on the southeast portion of the site; and (3) Esso's allegedly-unlawful

14  implementation of a CAP before EQB approved that plan under EQB UST Regulation 607.

15  Neither the law nor the facts support these allegations.

16          **2.      EQB UST Regulation 504**

17          In suggesting that a release of hydraulic oil from the above-ground lift tank implicates

18  Rule 504, Plaintiffs patently misapply the law.  In suggesting that a release of hydraulic oil

19  occurred at this site, they misconstrue the facts.

1      EQB UST Regulation Rule 504 and its federal counterpart require owners and operators

2      of UST systems to take immediate action (within 24 hours) to address spills and overfills of

3      petroleum products.  See 40 C.F.R. § 280.53; P.R. Admin. Reg. 4362, Rule 504.  Like all UST

4      rules, these requirements do not apply to "[e]quipment or machinery that contains regulated

5      substances for operational purposes such as hydraulic lift tanks and electrical equipment tanks."

6      40 C.F.R. § 280.10(b)(3); P.R. Admin. Reg. 4362, 103(B)(3).  Thus, these rules would not apply

7      to any alleged release as a matter of law.  Moreover, the definition of UST expressly excludes

8      any "[s]torage tank situated in an underground area (such as a basement, cellar, mineworking,

9      drift, shaft, or tunnel) if the storage tank is situated upon or above the surface of the floor.  The

10     term . . . 'UST' does not include any pipes connected to any [such tank]."  40 C.F.R. § 280.12

11     (defining "Underground Storage Tank or UST"); P.R. Admin. Reg. 4362, Rule 105 (same).

12     The testimony relating to this tank established that it was a tank holding hydraulic oil,

13     installed on the floor of a subsurface pit.  (Docket No. 460 at 10.)  Thus, it is not a UST subject

14     to these rules as a matter of law.  Finally, as established in the testimony of Esso's

15     environmental expert, Connor, soil and groundwater sampling in the vicinity of this tank found

16     no evidence to indicate that a leak of hydraulic oil occurred.  (Docket No. 460 at 205–06.)

17     **3.     EQB UST Regulation 606**

18     Plaintiffs contend that Esso previously and continuously failed to "fully delineate"

19     benzene and TPH contamination allegedly caused by leaks from Esso-owned USTs on the

20     southeast portion of the site, in violation of Rule 606 of the EQB UST Regulations ("Rule 606")

1    and its federal counterpart.  See 40 C.F.R. § 280.65; P.R. Admin. Reg. 4362, Rule 606.  As

2    before, this argument fails both as a matter of law and as a matter of fact.

3            We must first note that Plaintiffs have failed to meet their burden of establishing that any

4    release ever occurred from an Esso-owned UST.  The tanks at this site have had a complicated

5    ownership history.  Regarding the tanks located on the southeast portion of the station, where

6    benzene and TPH have been found, we must consider three separate operating periods.  First,

7    from around the 1960s to 1985, Shell owned the gasoline tanks at the service station.  (Docket

8    No. 460 at 109–110.)  Moreover, either Shell or someone else owned a diesel tank on the

9    southeast portion of the property from the 1960s until 1992.  (Docket No. 24 at 45.)  The

10   evidence also suggests that for some period of that time there were one or more gasoline tanks

11   located in that southeast area.  (Docket No. 458 at 121.)  In 1992, Esso replaced the existing

12   diesel tank with a new, state-of-the-art tank that remains in place to this day.  (Docket No. 24

13   at 45.)  Plaintiffs provided no credible evidence that a release ever occurred from this new tank.

14   Indeed, the testimony of Esso's experts and witnesses as to the operation, construction, and

15   technological superiority of its tanks lead this court to conclude that any release from a UST in

16   this area—if one occurred —is most likely to have occurred from tanks that were never owned

17   or operated by Esso.

18           Even had we concluded that the identified contamination was caused by a release from

19   an Esso-owned tank, we find that Esso was in compliance with Rule 606 and federal

20   requirements as of the time that Plaintiffs filed suit.  The evidence clearly establishes that Esso

Civil No. 08-2151 (JAF)                                                      -18-

1    had sufficiently delineated and begun corrective actions at this site well before this action

2    commenced.  (<u>See</u> Docket No. 458 at 104–10.)  Indeed, Esso had already filed and had started

3    to implement a CAP under EQB supervision.  Esso representative Figueroa testified about his

4    regular communications with the EQB regarding the CAP, and explained that Esso was

5    proceeding with the remediation plan, interrupted only by the filing of this suit.

6           Contrary to Belgodere's apparent belief, the rules do not provide a deadline by which

7    delineation must be completed, nor do they require that sites be delineated absolutely and

8    completely.  Rather, as described by Esso's expert, Connor, the rules outline a practical

9    approach to investigating site conditions, which includes site-specific data needs and risk-based

10   decision making to help guide appropriate investigations and cleanups.  Were we to adopt

11   Plaintiffs' interpretation, every single owner and operator of a UST facility would be in

12   "continuing violation" of Rule 606 until investigation is completed—a process that can take

13   many years.  A review of the case law does not reveal a single instance in which a court has

14   taken such an extreme position by punishing parties that are actively engaged in investigation

15   and cleanup activities.  Rather, the courts have reserved such treatment only for parties that flout

16   agency requirements by refusing to conduct such activities when directed to do so.  <u>See, e.g.</u>,

17   <u>Coll. Park Holdings, LLC v. RaceTrac Corp.</u>, 239 F. Supp. 2d 1334, 1348 (N.D. Ga. 2002)

18   (holding party refusing to submit and implement required CAP to be in continuing violation of

19   Subchapter IX requirements).

Civil No. 08-2151 (JAF)                                                                    -19-

1        Esso was in the midst of investigating and cleaning up this site under the direct

2    supervision of EQB and in full compliance with applicable standards when Plaintiffs filed suit.

3    Therefore, Esso cannot be said to have been in continuing violation of Rule 606 or its federal

4    counterpart.

5        **4.      EQB UST Regulation 607**

6        Contradicting their Rule 606 argument, Plaintiffs contended at trial that Esso was in

7    violation of Rule 607 of the EQB UST Regulations ("Rule 607") for failing to wait for EQB

8    approval before implementing the CAP.  However, Rule 607 plainly permits that "owners and

9    operators may, in the interest of minimizing environmental contamination and promoting more

10   effective cleanup, begin cleanup of soil and groundwater before the corrective action plan is

11   approved" under certain conditions such as those Esso has met or is committed to meeting.  40

12   C.F.R. § 280.66(d); P.R. Admin. Reg. 4362, Rule 607(D).  (See also Docket No. 458 at

13   141–42.)  Accordingly, Esso's pre-implementation of its CAP is not a violation of RCRA.

14       **5.      Subchapter III**

15       Plaintiffs have generically argued that Esso violated RCRA Subchapter III by allowing

16   leaks of hydraulic oil, gasoline, or diesel from Esso-owned tanks to occur.  According to

17   Plaintiffs, this constitutes illegal disposal of solid and hazardous waste without a permit.  We

18   note at the outset, however, that Plaintiffs have failed to establish that any such release occurred

19   from Esso-owned or operated equipment.

1  **B.      § 6972(a)(1)(B)**

2       Plaintiffs failed to carry their burden to establish an imminent and substantial

3  endangerment to health or the environment.  Plaintiffs set forth no credible evidence of an

4  imminent and substantial endangerment to human health, relying instead on Belgodere's

5  unsupported testimony that any levels exceeding a Maximum Contaminant Level ("MCL") or

6  soil screening level constitute such a threat.  Aside from his being patently unqualified to testify

7  as to such matters, Belgodere's assertions are simply wrong.  As the First Circuit has made

8  abundantly clear, the "mere presence" of contamination alone cannot support a claim of

9  imminent and substantial endangerment. See Mallinckrodt, 471 F.3d at 282.  Indeed, faced with

10  similar arguments, other courts have noted that the exceedance of a regulatory standard cannot

11  in and of itself prove imminent and substantial harm. See Orange Env't, Inc. v. Cnty of Orange,

12  860 F. Supp. 1003, 1028–29 (S.D.N.Y. 1994).

13       Furthermore, without a current or likely future pathway of exposure to humans,

14  contamination cannot be said to be causing an imminent and substantial endangerment to their

15  health.  See Interfaith Comm. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 260 n.5 (3d Cir.

16  2005) (noting that the existence of a pathway for current or future exposure is an implicit

17  requirement in a finding of imminent and substantial endangerment).

18       As the unrefuted testimony of Dr. Kester established, no such exposure pathway exists,

19  as no potentially actionable soil contamination can be found at the ground surface and as the

20  groundwater with identified contamination is not used for drinking purposes.  (Docket No. 459

1    at 60–62.)  Moreover, as Connor explained, no such pathway is likely ever to exist, as the

2    plume, or area of groundwater contamination, is small, diminishing rapidly in concentration,

3    stable, and in a shallow area not now or likely ever to be used for drinking water purposes.[12]

4            For the same reasons as outlined above, Plaintiffs failed to establish the potential for an

5    imminent and substantial endangerment to the environment at this site.  Once again, it is not

6    enough for Plaintiffs to prove only that contamination is present at the site.  Rather, as the First

7    Circuit held in Mallinckrodt, Plaintiffs are required to produce additional evidence quantifying

8    the potential risk to the environment posed by the identified contaminants.  While "imminence"

9    does not require that the "harm necessarily will occur or that the actual damage will manifest

10   itself immediately," it must, nevertheless, be of the "kind that poses a near-term threat."

11   Mallinckrodt, 471 F.3d at 288.  This threat was neither a short-term nor a long-term possibility.

12   The testimony of Dr. Kester and Connor, as outlined above in Part II.B– C. refutes any

13   suggestion that there has existed or will ever exist the type of "serious" harm to the environment

14   necessary to support a claim of imminent and substantial endangerment.

---

[12] Connor estimates that the benzene concentration in the slow-moving groundwater would only be able to extend another 400 feet from the source.  He testified that benzene would not pose an imminent or substantial harm to human health or the environment, as the nearest potential drinking water lies 3,000 feet away, and the Río Grande de Loíza, the closest "ecological receptor," is 2,500 feet away.  (Def. Ex. 55 at 23.)

1                                                          **IV.**

2                                              **Injunctive Relief**

3                This court entered a preliminary injunction upon Plaintiffs' motion on December 5, 2008.

4        (Docket No. 22.)  Plaintiffs' support for its injunction rested almost entirely upon the testimony

5        of its expert Belgodere.   Now that this court has conducted a full trial on the merits and

6        evaluated the credibility of Belgodere's testimony in the context of this record as it stands today,

7        we find that the Plaintiffs, in particular their expert, misled this court with inaccurate

8        representations about the site and the proper application of the EQB regulations, and with false

9        testimony about the extent of contamination and risks associated with the contamination.

10               In fact, evidence adduced at the 2010 trial shows that Belgodere withheld relevant

11       information about the site's USTs during the preliminary injunction hearing, despite our direct

12       request for any reports pertinent to the issues at the hearing. (Dec. 3, 2008 Prelim. Inj. Hr'g,

13       Docket No. 24 at 26.)  Belgodere withheld the fact that he had contemporaneously concluded

14       that the site's USTs were not leaking, in a November 2008 report to Plaintiffs' insurer. (Def.

15       Ex. 48.)  Rather than providing that report, Belgodere misrepresented its contents, claiming it

16       merely confirmed that the tanks were in operation.  (Docket No. 41 at 28.)

17               As Sánchez readily conceded at trial, the current gasoline USTs, installed in 1992 and

18       1998, do not leak and have never leaked.  Nevertheless, Belgodere testified at the preliminary

19       injunction hearing that he "cannot tell you that, as of today, the underground storage tanks are

20       not leaking or the lines are not leaking or the pumps are not leaking." (Docket No. 24, 49-50.)

1       Plaintiffs presented other evidence at the preliminary injunction hearing through

2   Belgodere that has also proven to be false.  There is simply no credible evidence that any

3   contamination from the site could reach the Río Grande de Loíza River, nearly 3,300 feet away.

4   There is likewise no credible evidence that the contamination poses any health risk to the people

5   of Puerto Rico.  Now that a full factual record has been developed and presented at trial, it is

6   clear that Plaintiffs wrongfully procured injunctive relief based upon false testimony.

7       It is axiomatic that a party may not seek equitable relief with unclean hands.  As this

8   court has already held, "if it is determined that Esso has been wrongfully enjoined in this case,

9   Esso may be damaged in an amount approximating the cost of the assessment." (Docket No. 264

10  at 23.)  Plaintiffs posted a security bond pursuant to court order in the amount of $100,000.  (Id.

11  at 25.)   The cost of the assessment, based on the invoices from the two court-appointed

12  consultants who conducted it, is $448,501.48.  (Def. Exs. 61; 62.)  Plaintiffs never made any

13  representation of hardship with respect to securing their injunction.  (Docket No. 264 at 23.)

14      Seeking extraordinary relief, such as a costly environmental site assessment, is not

15  without risk.  Esso had already conducted a Phase II environmental assessment of the site.  In

16  fact, Plaintiffs relied on that assessment to establish to its insurer that the USTs were not

17  leaking.  (Def. Ex. 48.)   The costly CSA, conducted pursuant to the injunction, merely

18  confirmed the findings of the earlier Phase II assessment and the related work that had been

19  completed at the site prior to the preliminary injunction hearing.  (See Def. Exs. 51; 55.)

20  Furthermore, to analyze the CSA data, review the reports, and expose Belgodere's bad science

Civil No. 08-2151 (JAF)                                                                     -24-

1    in the On-Site reports, Esso was forced to spend $64,322.50 to employ the services of GSI

2    Environmental and Newfields for the services of experts Connor and Dr. Kester, respectively.

3    Now that the trial on the merits has been completed and it is clear that the injunction was

4    wrongfully obtained, Plaintiffs are left with the result of the equitable relief they sought.  In

5    total, Esso will recover a grand total of $512,823.98 from Plaintiffs for the combined costs of

6    the CSA and expert services.[13]  Plaintiffs are hereby ordered to surrender the security bond of

7    $100,000 and an additional $412,823.98 to Esso.

8                                                    **V.**

9                                       **Esso's Counterclaims**

10   **A.     CERCLA**

11          Esso has counterclaimed for cost recovery under CERCLA against Plaintiffs; Esso has

12   also brought an identical third-party claims against Third-Party Defendants as the owners and

13   operators of the service station and surrounding operations.  (Docket No. 301 at 11–16.)  In the

14   course of investigating this site, the court, prompted by Plaintiffs, required Esso to sample for

15   chlorinated solvent contamination in various locations.  The testimony established that

16   chlorinated solvents were not present in any of the petroleum products ever stored in Esso-

17   owned equipment or USTs.  (Docket No. 460 at 82–83.)  Rather, such materials are commonly

18   present in products used for auto repair and maintenance and other similar industrial uses, such

_____

[13] The grand total of $512,823.98 includes the following items: 1) $140,246.45 for On-Site's investigations for the CSA; 2) $308,255.03 for ERM's CSA investigations; 3) $49,922.50 for the services of Connor and GSI Environmental in analyzing the CSA data; and 4) $14,400 for the services of Dr. Kester and Newfields in analyzing the CSA data.

1    as degreasing and parts washing. (Id.)  Accordingly, any such contamination at the site must

2    have been released by someone other than Esso.  Esso seeks to recover only the $128,871.93

3    incurred to address these chlorinated solvent releases at the site.

4           CERCLA Section 107 allows Esso to recover necessary costs[14] incurred in response to

5    releases of hazardous substances from the owners and operators of the station and associated

6    property.  See 42 U.S.C. § 9607(a).  The station and other businesses located on the property

7    are facilities under CERCLA.  See 42 U.S.C. § 9601(9) (defining "facility" to include buildings,

8    structures,  equipment,  and  containers).    Cis-1,2-Dichloroethylene,  a  chlorinated  solvent

9    compound found in Esso's investigations, is a CERCLA hazardous substance.  See 40 C.F.R.

10   § 302.4 (listing 1,2-Dichloroethylene as a hazardous substance).  The  evidence  at  trial

11   established that chlorinated solvent contamination was found in trace amounts in soil and

12   groundwater samples on the western side of the station—a location where other tenants

13   conducted auto repairs, tire retreading, and other maintenance activities that commonly employ

14   products containing chlorinated solvents.  (See Docket No. 460 at 221–22.)  These undisputed

15   facts lead us to conclude that Plaintiffs and Third-Party Defendants are the current owners or

16   operators of the facilities from which these chlorinated solvents were released.

17          Neither Third-Party Defendants nor Plaintiffs provided evidence that their contribution

18   to this contamination was divisible.  Accordingly, Plaintiffs and Third-Party Defendants are

19   jointly and severally liable to Esso for the costs necessarily incurred by Esso in responding to

_____

[14] As a preliminary matter, we find that the costs of this work were necessary to address the potential for chlorinated solvent contamination that Plaintiffs identified as a concern.

1    this release.  See 42 U.S.C. § 9607(a); United States v. Davis, 261 F.3d 1, 44 (1st Cir. 2001)

2    (citing Acushnet Co. v. Monasco Corp., 191 F.3d 69 (1st Cir. 1999) (holding that CERCLA

3    defendants bear the burden of proof to disprove joint and several liability)).

4          We must also evaluate whether Esso incurred its costs in a manner consistent with the

5    National Contingency Plan ("NCP").  See 42 U.S.C. § 9607(a)(4)(B).  To do so, we must

6    determine whether Esso substantially complied with the applicable requirements of the NCP.

7    See 40 C.F.R. § 300.700(c)(3)(I).  Esso incurred these costs while conducting court-mandated

8    removal actions including investigation and site characterization. See 42 U.S.C. § 9601(23)

9    (defining removal to include investigation of releases).  Because the planning period for these

10   removal actions did not exceed six months, they are properly considered "time-critical" removal

11   actions to which only minimal NCP requirements apply.  See 40 C.F.R. § 300.415(4) (outlining

12   procedural requirements applicable to removal actions for which the planning period exceeds

13   six months).  This work was conducted with the full knowledge of the EQB under the auspices

14   of Esso's continuing CAP obligations.  This fact alone is enough to support a finding of NCP

15   consistency.  See City of Bangor v. Citizens Comm. Co., 532 F.3d 90, 91 (1st Cir. 2008)

16   (holding that the fact that a response action was "carried out under the approval and monitoring

17   of the appropriate state environmental agency" is often enough to prove NCP consistency even

18   for more formal remedial actions).  Copies of the work plans and all results were filed with

19   EQB, and thereby made available for public review.

1      The costs were properly accounted for by Esso and, in part, were approved as reasonable

2      by this court.  We also accept as reasonable and appropriate the methodology used by Esso to

3      identify and segregate these costs from other costs incurred at the site.  Accordingly, we find

4      that Esso has incurred these costs in a manner consistent with the NCP, and we hold Plaintiffs

5      and Third-Party Defendants jointly and severally liable to Esso in the amount of $128,871.93.

6      (See Docket No. 458 at 127–29 (explaining calculation of costs).)  Of course, we cannot permit

7      Esso to receive a double recovery—we have already awarded them the costs for the entire court-

8      ordered site assessment, which includes $128,871.93, the isolated cost of the chlorinated

9      solvents.

10     **B.      Contractual Indemnity**

11     During trial, Esso submitted the contracts that set forth the scope of its contractual

12     relationship with Sánchez and the Sánchez Parents.  (Def. Exs. 3; 4; 7; 8.)  In these contracts,

13     Sánchez and the Sánchez Parents, jointly referred to here as "The Retailer," agreed to:

14                 assume[] the risk and exclusive liability, and agree[d] to hold
15                 harmless ESSO, from any and all claims for injuries, loss, or
16                 damage of any class or kind, to person or property, by anyone who
17                 suffers or alleges the same, as a result of:

18                 (a) The condition or use of the leased station, with all of its
19                 edifices, improvements, and equipment, or the operation thereof by
20                 the Retailer during the term of this lease or any renewal or
21                 extension hereof, regardless of whether it is due to a hidden or
22                 evident defect, except, however, when the Retailer has sent a
23                 written notification to ESSO about a defective condition for whose
24                 repair ESSO is responsible under this lease and as long as the
25                 Retailer has taken all reasonable precautions to prevent the

1       occurrence of injuries, deaths, losses, and damages attributable
2       exclusively and directly to such defective condition.

3       (b) The negligence or conduct of the Retailer, its agents,
4       contractors, or employees, even if manifested inside or outside of
5       the station, or of any other person who penetrates the premises
6       upon express or implicit invitation from the Retailer.

7       (c) The breach by the Retailer, its agents, servants, or employees
8       of any provision of this lease.

9     (Def. Exs. 4; 8.) Esso argues that the above provisions require Sánchez and the Sánchez Parents

10    to indemnify Esso for costs incurred to address the environmental conditions at the site, and

11    attorneys' fees Esso has expended on its own behalf in this case.  (Docket No. 458 at 21–22.)

12    As we have already assessed the costs of the ERM and On-Site site assessments and the services

13    of GSI and Newfields against Plaintiffs ($512,823.98); the battle now shifts to attorneys' fees

14    and litigation costs.  The total sum of costs Esso seeks are summarized as follows:

| Concept | Total Amount |
|---|---|
| O'Neill & Borges | $433,818.07 |
| O'Neill & Borges additional costs | $ 17,242.62 |
| Baker Botts | $682,018.28 |
| **Current Total** | $1,133,078.97 |

20         Under Puerto Rico law, contractual obligations have the force of law between the

21    contracting parties and must be fulfilled as agreed, so long as these obligations are legal, valid,

22    and without defect.  31 L.P.R.A. § 2994; see also 31 L.P.R.A. § 3372.  Whenever one of the

23    contracting parties fails to comply with its obligations under the contract, the prejudiced, non-

24    breaching party may judicially demand fulfillment of such obligations and payment of interest.

1    31 L.P.R.A. § 3052.  Accordingly, the courts may not relieve a litigant of its obligations to

2    comply with a contractual agreement, but must, instead, ascertain the parties' obligations

3    pursuant to their agreement and enforce them as the law relevant and applicable to the litigation.

4    Myers v. Benus Silva, 208 F. Supp. 2d 155, 160 (D.P.R. 2002); Hennes v. Sun Life Assurance

5    Co., 291 F. Supp. 670, 673 (D.P.R. 1968).

6            Moreover, one of the basic principles of Puerto Rico contract law is that "[t]he

7    contracting parties may make the agreement and establish the clauses and conditions which they

8    may deem advisable, provided they are not in contravention of law, morals, or public order."

9    31 L.P.R.A. § 3372 (official translation).  Under Puerto Rico law, the parties may generally

10   "bargain for a 'hold harmless' agreement that indemnifies the indemnitee for varying degrees

11   of liability....  If the parties' intent is clear, these provisions will be upheld so long as the court

12   finds no breach of duty to the public."  R.L. Meyers III & D.A. Perelmann, Risk Allocation

13   Through Indemnity Obligations in Construction Contracts, 40 S.C. L. Rev. 989, 990–991

14   (1989), cited approvingly in Torres Solís v. Autoridad de Energía Eléctrica de P.R., 136 D.P.R.

15   302, 313–16 (1994) (holding an indemnity clause enforceable).

16           In the present case, the pertinent contractual provisions do not allow Esso to seek

17   indemnification.  Although the agreement does allow Sánchez and the Sánchez Parents to

18   indemnify Esso in the event of third-party claims against Esso, indemnification for costs in a

19   suit between the contracting parties falls beyond the scope of the agreement.  The language of

20   the provision itself reveals that the parties intended for Sánchez and the Sánchez Parents to

1    indemnify Esso for "any and all claims for injuries, loss, or damage of any class or kind, to

2    person or property, by anyone who suffers or alleges the same, as a result of" the conditions or

3    operations of the service station.  (Def. Ex. 4 at 8.)  A common-sense reading leads us to

4    conclude that this provision referred to claims brought by third parties for injuries suffered in

5    connection with the service station, not claims by Esso for costs incurred in defending a suit

6    between the parties.[15]

7            The language indicates that Sánchez and the Sánchez Parents agreed to hold Esso

8    harmless for any third-party claims against it, not to pay for costs of environmental remediation

9    or the costs of defending a suit between the two parties.  (See also Docket No. 369-1 at 2.)[16]

10   As a result, Esso has no basis to recover the costs above under its indemnity claim.  However,

11   we do find that Esso, as the prevailing party, has alternate means to recover its litigation costs.

_____

[15] Esso referred to this agreement as an "indemnity" provision throughout the trial. "Although this word can imply any right to reimbursement, it commonly presumes a tripartite arrangement, in which A recovers from B for losses to C.  Longport Ocean Plaza Condo., Inc. v. Robert Cato & Associates, Inc., 137 Fed. Appx. 464, 466–67 (3d Cir. 2005) (No. 03-3814, 03-3882) (citations omitted) (holding broad indemnity clauses did not require plaintiff to reimburse defendant for fees in plaintiff's action against defendant); see also Penthouse N. Ass'n. v. Lombardi, 461 So. 2d 1350, 1353 (Fla. 1984) (citations omitted) (rejecting similar claim for attorneys' fees under indemnity provision governed by Florida law, explaining that if plaintiffs had been "successful in their litigation, they would nevertheless have [had] to satisfy their own judgment in addition to paying the [defendant's] costs").

[16] Docket No. 369-1 is a certified translation of a Puerto Rico case involving Esso, a similar station owner-plaintiff, and a similar hold-harmless clause.  There, the court refused to enforce the hold-harmless clause in a manner that would hold Esso harmless for damage caused by gasoline leaks.  See Rodriguez Perez v. Esso Standard Oil Co., No. KLAN20020590 at 1037 (P.R. Ct. App. May 27, 2003).

Civil No. 08-2151 (JAF)                                                                -31-

**VI.**

**Costs and Attorneys' Fees**

1    

2    

3        Esso may be able to recover costs under Federal Rule of Civil Procedure 11, 28 U.S.C.

4    § 1927, or this court's inherent power to sanction.  We will discuss each option in turn, but we

5    first discuss our findings of fact regarding the conduct of Plaintiffs' litigation team over the

6    course of this suit.

7    **A.      Findings Regarding the Conduct of Plaintiff's Litigation Team**

8        Although Plaintiffs might have begun the suit earnestly believing in the validity of their

9    claims, we find that Plaintiffs and their attorney, Orlando Cabrera, should have known by mid-

10   2009 that their claims were frivolous, unreasonable, and lacking a factual foundation.  With the

11   possible exception of certain benzene concerns, after the completion of the August 3, 2009,

12   court-ordered CSA reports, and certainly by the time of the August 2010 supplemental report,

13   Plaintiffs should have realized they could not meet the legal standards to pursue their claims

14   under 42 U.S.C. § 6972(a)(1).

15       In 2008, Plaintiffs and their expert offered predictions of massive contamination at the

16   site, emphasizing the dangers of potential lead contamination in the soils and groundwater.

17   (Docket No. 41 at 40.)  Seven months and hundreds of thousands of dollars later, a far less

18   menacing picture materialized.[17]  The July 24, 2009, ERM report and the August 3, 2009, On-

_____

[17] During cross-examination, Belgodere admitted that in 2008, he "told the Court that the biggest concern [he] had about this site was lead," but that they've since "tested for lead and they haven't found any lead in excess of the MCL."  (Docket No. 460 at 64–66.)

1    Site report revealed soil and groundwater lead concentrations well below 400 milligram per

2    kilogram, the EPA recommended screening levels for lead in residential site soils.  (See Docket

3    No. 459 at 63.)

4          While tests for TPH found that monitoring wells MW-208 and MW-211 had

5    concentrations of DRO above the EQB screening guidelines, the 2009 ERM report determined

6    that neither well was located near any USTs and that the DRO was, in fact, "likely attributed

7    to a near surface release of petroleum hydrocarbons related to the operation of the mechanical

8    shop [unaffiliated with Esso] adjacent to and west of MW-208," instead of to any USTs.  (Def.

9    Ex. 55 at 30–31.)  The 2009 On-Site report repeated these findings but did not mention the

10   location of the monitoring wells in relation to USTs, and offered no explanation regarding a

11   potential source of the DRO.  (Ptfs. Ex. 2 at 5.)  However, the On-Site report did offer, as the

12   first bulleted point in its "Conclusions" section, that "[v]irtually all of the groundwater below

13   the Service Station is impacted with gasoline constituents," before announcing that the

14   "hydrocarbon contamination laboratory results indicate that the vertical and horizontal extent

15   has not been determined."  (Id. at 23–24.)

16         After the 2009 results failed to support the bulk of their allegations, Plaintiffs clung to

17   the few findings of contamination that could plausibly sustain their claims; including a benzene

18   contamination plume, which Belgodere attempted to convince the court were unstable in

19   concentration and location.[18]   (Docket No. 456 at 54–55.)   As discussed above, such

_____

       [18]  In their complaint, Plaintiffs alleged that 2006 water samples revealed "dissolved
concentrations of benzene as high as 2,800." (Docket No. 1 at 8.) Groundwater benzene concentrations

1    unsupported allegations of a mysterious, ever-moving benzene plume made by an unreliable

2    witness alone cannot sustain a § 6972(a)(1)(B) claim.  Cabrera should have reviewed the

3    findings in conjunction with the § 6972(a)(1) standards.  He should have realized then that

4    plaintiffs could not continue suit, instead of continuing to submit misleading and inflammatory

5    reports to the court.

6          Earlier this year, this court denied Esso's motion to dismiss, in part because of Plaintiffs'

7    continued allegations of leaks from USTs previously owned by Esso.  (Docket No. 279 at 12

8    ("[O]wners and operators of USTs are subject to other rules that impose ongoing duties.").)

9    Yet, even after the 2009 CSA report, no potential contamination was ever found to indicate a

10   past or present leak from any Esso-owned USTs.  In fact, in November 2008, Belgodere

11   authored a report for Plaintiffs for insurance purposes, which concluded that "at the time Esso

12   transferred the ownership of the USTs to TOTAL Petroleum, there were no active releases of

13   petroleum products into the facility soils or groundwater."  (Def. Ex. 50 at 5.)  Moreover, at

14   trial, Sánchez informed this court that he knew of no leaks from the current tanks.  (Docket

15   No. 460 at 118.)  Through a reasonable inquiry into the facts, or even by asking his client

16   directly, Cabrera could have determined that the claims surrounding UST leaks were baseless.

17   Unfortunately, not only did Belgodere and Cabrera continue to focus on imaginary UST leaks,

—————————————

were lower in 2010 than in 2009.  (See Pls' Ex. 2 at App. B; Def. Ex. 23; 55).  As of the 2010 report,
however, the highest benzene level found was .5 ug/L, well under the EPA MCL of .005 mg/L.  (Id.)

Civil No. 08-2151 (JAF)                                                                    -34-

1    but they also continued to obscure the picture at trial by repeatedly referring to a hydraulic oil

2    tank, most likely situated <u>above</u> ground, as a "UST."  (Docket No. 458 at 26–30.)[19]

3           By August 3, 2009, it should have been become clear that they could not bring a

4    plausible RCRA claim.  Although we perceived no animus or bad faith in Sánchez initially, we

5    do find that Plaintiffs' litigation team frivolously, vexatiously, and unreasonably continued the

6    litigation, despite a year's worth of contrary factual findings to indicate their claims were

7    groundless.  Belgodere in particular, with his blatant animus toward Esso, ignored and twisted

8    facts in order to protract the litigation.  We find that Plaintiffs, within a reasonable time after

9    the August 3, 2009, On-Site report, should have become aware that they could show neither a

10   continuing actionable ongoing violation nor any imminent and substantial endangerment to

11   health or the environment.

12   **B.     <u>Federal Rule of Civil Procedure 11</u>**

13          We must determine whether the conduct described above in Section IV.A. violates

14   Federal Rule of Civil Procedure 11.  "On its own, the court may order an attorney, law firm, or

15   party to show cause why conduct specifically described in the order has not violated Rule

16   11(b)."   Fed. R. Civ. P. 11(c).   Rule 11 prohibits filing documents with the court for any

17   "improper purpose," offering "frivolous" arguments, or asserting  "factual allegations without

18   'evidentiary support' or the 'likely' prospect of such support."   <u>Young v. City of Providence</u>,

19   404 F.3d 33, 39 (1st Cir. 2005).  Rule 11 sanctions seek to "deter dilatory and abusive tactics

---

[19] More baffling was Belgodere's nearly-incoherent testimony indicating that said hydraulic fluid tank was actually situated <u>above</u> the ground.  (Docket Nos. 456 at 22; 460 at 10.)

Civil No. 08-2151 (JAF)                                                                    -35-

1   in litigation and to streamline the litigation process by lessening frivolous claims or defenses."

2   Cruz v. Savage, 896 F.2d 626, 630 (1st Cir. 1990).  The First Circuit has acknowledged that

3   Rule 11 is "not a strict liability provision;" and that a "lawyer who makes an inaccurate factual

4   representation must, at the very least, be culpably careless."  Young, 404 F.3d at 39.  The

5   attorney or party who signs the pleadings represents that the claims and facts within are

6   "warranted by existing law." Fed. R. Civ. P. 11(b)(2).  This imposes upon the party or attorney

7   "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing."

8   Bus. Guides, Inc. v. Chromatic Commc'ns.. Enters., 498 U.S. 533, 551 (U.S. 1991).  "[T]he

9   applicable standard is one of reasonableness under the circumstances."  Id.

10          An argument will not qualify as frivolous under Rule 11 if it is "warranted by existing

11   law or by a nonfrivolous argument for the extension, modification, or reversal of existing law

12   or the establishment of new law."  Id.  In other words, a merely "hopeless" argument, brought

13   in good faith, does not violate Rule 11.  Obert v. Republic W. Ins. Co., 398 F.3d 138, 146 (1st

14   Cir. 2005).

15          Plaintiffs' arguments, testimony, and filings in the present case, however, ignored the law

16   and distorted the facts, thus exceeding the bounds of mere hopelessness.  See id. ("In this case,

17   the show cause order was prompted not by a concern that the [relevant] motion was objectively

18   hopeless and so wasted a few hours but by what were perceived to be deliberate

19   misrepresentations.").

Civil No. 08-2151 (JAF)                                                                          -36-

1          Plaintiffs not only ignored the relevant facts, results of the CSA reports, and the law, but

2    also forced Esso to expend large sums of money to continue conducting site-assessment reports.

3    By 2010, when those reports failed to find any serious problems at the site, plaintiffs and their

4    expert attempted to convince this court that a mere "snapshot" assessment would not suffice to

5    delineate contamination at the site, and that further monitoring was required.  (Docket No. 456

6    at 14.)  Furthermore, as discussed above, Plaintiffs misrepresented both law and facts at trial.

7    While an attorney should hire an expert witness for technically-complex litigation with the

8    objective of vigorous advocacy on behalf of the client, the attorney and expert must also ensure

9    they do not cross the line from persuasion into deception in pursuit of that objective.

10         Unfortunately, Cabrera allowed Belgodere to insert himself into the court-appointed

11   investigation team, as Belgodere's signature in On-site's 2009 and 2010 reports can

12   demonstrate.  On Cabrera's watch, Belgodere's egregious conduct, such as tampering with the

13   conclusions in On-Site's 2010 report, went too far.  Beyond his obvious bias and hatred of Esso,

14   a simple legal database search could have revealed to Cabrera that other courts have already

15   condemned Belgodere's behavior and attitude in similar litigation.  See e.g., Cotto, 389 F.3d

16   212, 216 (1st Cir. 2004).

17         Cabrera should have made a reasonable inquiry into Belgodere's background and should

18   have known that his credibility would play an essential role in his qualification as an expert

19   witness.  See Duncan v. WJLA-TV, Inc., 106 F.R.D. 4, 6 (D.D.C. 1984) (imposing sanctions

20   and holding that "requirements of Rule 11 placed a presignature obligation on plaintiff and her

Civil No. 08-2151 (JAF)                                                          -37-

1    attorney to conduct a reasonable inquiry into the qualifications of their expert before filing a

2    pleading containing erroneous information").  Instead, Cabrera continued filing, signing, and

3    advocating frivolous and unreasonable pleadings well into 2010, such as the amended

4    complaint, motions to dismiss, and a fallacious reply statement of "undisputed facts" in response

5    to Esso's motion for summary judgment. (Docket Nos. 350; 367; 380.)

6            Sanctions may be imposed where, "after reasonable inquiry, a competent attorney could

7    not form a reasonable belief that the pleading is well grounded in fact and is warranted by

8    existing law or a good faith argument for the extension, modification or reversal of existing

9    law." Kale v. Combined Ins. Co., 861 F.2d 746, 759 (1st Cir. 1988) (quoting Eastway Constr.

10   Corp. v. New York, 762 F.2d 243, 254  (2d Cir. N.Y. 1985)).  After considering the "objective

11   reasonableness of the litigant's conduct under the totality of the circumstances," we find that

12   Cabrera failed to make a reasonable inquiry into the facts underlying the claims.[20]

13   Navarro-Ayala v. Nunez, 968 F.2d  1421, 1425 (1st Cir. 1992);  Ryan v. Clemente, 901 F.2d

14   177 (1st Cir. Mass. 1990).  We further find that the results of the 2009 reports, especially those

15   contained in the On-Site reports tainted by Belgodere's tampering, did not support a reasonable

16   belief that the pleading was well-grounded in fact or law.

_____

         [20] Giving Plaintiffs the benefit of the doubt, perhaps their concerns over benzene could be
construed as nonfrivolous but hopeless, as the lack of exposure pathways from the site precluded a
successful claim of imminent and substantial endangerment to health or environment under 42 U.S.C.
§ 6972 (a)(1)(B).  Regardless, other courts have noted that a "litigant cannot expect to avoid all
sanctions under Rule 11 merely because the pleading or motion under scrutiny was not entirely
frivolous."  Melrose v. Shearson/Am. Express, Inc., 898 F.2d 1209, 1215 (7th Cir. 1990).

Civil No. 08-2151 (JAF)                                                                -38-

1    **C.      28 U.S.C. § 1927**

2            Under 28 U.S.C. § 1927,[21] a court may order counsel to pay the excess costs of litigation

3    when "an attorney"s conduct in multiplying proceedings is unreasonable and harassing or

4    annoying"" Savage, 896 F.2d at 631–32 (1st Cir. 1990).  A court may award costs or fees under

5    § 1927 only when an attorney's conduct shows a "serious and studied disregard for the orderly

6    process of justice." Id. At 632.  The First Circuit does not require a "finding of subjective bad

7    faith as a predicate to the imposition of sanctions." Id. at 631–32.

8            We are aware that a court should not deploy § 1927 lightly.  The requirement that

9    "multiplication of the proceedings be 'vexatious' necessarily demands that the conduct

10   sanctioned be more severe than mere negligence, inadvertence, or incompetence." Id. at 632.

11   We find that Cabrera unreasonably and vexatiously multiplied the proceedings in this case by

12   (1) needlessly pursuing claims after it became clear they would not succeed; (2) attempting to

13   bring new supplemental claims over a year after filing suit; and (3) repeatedly obfuscating facts

14   and terminology at trial.  Id. at 633 (upholding district court's award of attorneys' fees under

15   § 1927 when counsel stubbornly pursued fruitless claims and obfuscated issues despite warnings

16   from the court).  Finally, prior to trial, Cabrera "was in a position to know the claims were

17   unsupported by fact or law." Id.  Beyond merely bringing frivolous claims, Cabrera multiplied

---

[21] 28 U.S.C. § 1927 provides: "Any attorney or person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

1    proceedings and misrepresented the impact of the findings from the site, misled this court, and

2    abused his position of trust by taking Plaintiffs, Defendant, and this court for a ride.

3    **D.      Inherent Power to Sanction**

4            District courts have the inherent power to sanction a party who "acted in bad faith,

5    vexatiously, wantonly, or for oppressive reasons." Chambers v. Nasco, 501 U.S. 32, 45–46

6    (1991).  In Chambers, the Supreme Court acknowledged a district court's power to assess

7    attorneys' fees when a party "shows bad faith by delaying or disrupting the litigation or by

8    hampering enforcement of a court order." Id. at 46 (quoting Alyeska Pipeline Serv. Co. v.

9    Wilderness Soc'y, 421 U.S. 240, 258 (U.S. 1975)).  As discussed in detail in Section IV.A.,

10   Plaintiffs vexatiously and unreasonably delayed litigation and hampered enforcement by tainting

11   the court-ordered CSA report from On-Site with Belgodere's bias.  We find that Plaintiffs'

12   litigation team acted in bad faith by obscuring the findings of the CSA report, attempting to

13   deceive this court about the status and ownership of the USTs, and dragging out the expensive

14   litigation for over a year without factual support and "without any reasonable hope of

15   prevailing" on the merits. Whitney Bros. Co. v. Sprafkin, 60 F.3d 8, 14 (1st Cir. 1995); see also

16   Chambers, 501 U.S. at 49; F.A.C., Inc. v. Cooperativa Seguros Vida P.R., 563 F.3d 1, 13 (1st

17   Cir. 2009).

18          In technically-complex litigation, a layman such as Sánchez depends on his counsel in

19   deciding what claims to bring and whether to continue pursuing such claims.  We observed no

20   deception, defensiveness, or animus in Sánchez during his testimony, and we understand that

1    he initially had no deceptive purpose.  At trial, he readily admitted that the current USTs did not

2    leak, and had not ever leaked, and that he had sought to insure said USTs in 2008.  (Docket 460

3    at 118.)  But while Sánchez might not have acted in bad faith initially, he is not entirely without

4    blame.  We find that, as a businessman and plaintiff, he had a duty to keep abreast of the

5    particulars of the litigation and to ensure facts alleged did not contradict his personal knowledge

6    of the site conditions.  When a lawyer and expert witness lead a willing plaintiff to persistently

7    litigate frivolous claims, everyone loses.

8                                                              **VII.**

9                                                        **Conclusion**

10           Having highlighted the conduct throughout the litigation that serves as the basis for

11    assessing costs under § 1927 or, in the alternative, under either Rule 11 or the court's inherent

12    power to sanction, we exercise our discretion and assess fees and costs against Plaintiffs and

13    their attorney.[22]  Additionally, we note that because Plaintiffs should have been on notice of the

14    hopelessness of their claims after the August 3, 2009, CSA report, we will grant Esso reasonable

15    attorneys' fees for the latter portion of the litigation, leading up to the trial on August 16-19,

16    2010.

17           Esso will submit, **on or before October 19, 2010**, a verified petition for attorneys' fees

18    consistent with this order, and in strict compliance with the attorneys' fees lodestar method as

_____

[22] RCRA's fee-shifting statute also supports shifting costs and fees to the prevailing party in certain situations, providing that the court "may award costs of litigation (including reasonable attorney and expert-witness fees) to the prevailing or substantially-prevailing party, whenever the court determines such an award is appropriate."  42 U.S.C. §6974(e).

Civil No. 08-2151 (JAF)                                                                          -41-

1    interpreted by First Circuit case law so that we can determine the reasonable amount of

2    attorneys' fees to award.  See Burke v. McDonald, 572 F.3d 51, 56 (1st Cir. 2009).  Sánchez

3    and Cabrera will be heard on this issue.  See Chambers, 501 U.S. at 50 (noting that court "must

4    comply with the mandates of due process" before imposing sanctions).  Their filing is expected

5    to be on record **not later than November 4, 2010**.[23]

6           To conclude, the complaint filed by Plaintiffs is **dismissed**.  The preliminary injunction

7    ordered by this court on December 5, 2008, is **vacated** (Docket No. 22).  Esso will recover the

8    amount of $448,501.48, the cost of the court-ordered CSA investigation, from Plaintiffs.  Esso

9    may also recover from Sánchez $64,322.50, the costs of employing the services of GSI

10   Environmental and Newfields to analyze the CSA reports and provide the expert reports and

11   services of experts John A. Connor and Dr. Janet Kester.  In total, Esso may recover

12   $512,823.98 from Plaintiffs for the combined costs of the CSA and expert services.

13          However, Esso may recover a portion of this amount—$128,871.93, representing the

14   costs of the chlorinated solvents under its CERCLA claim—jointly and severally from Third-

15   Party Defendants and Plaintiffs.

_____

[23]Some courts have declined to impose full sanctions or to assess full costs when it would result in the "financial ruin" of a party.  Motzkin v. Trustees of Boston Univ., No. 95-10450-RCL, 1996 U.S. Dist. LEXIS 20692, at *7 (D. Mass. Nov. 22, 1996) (citing Andrade v. Jamestown Hous. Auth.) (refusing to assess sanctions against elderly, unemployed defeated plaintiff), 82 F.3d1179, 1193 (1st Cir. 1996)).  Of course, it is up to Plaintiffs to submit proof of the state of their finances if they want that aspect to be considered.

Civil No. 08-2151 (JAF)                                                          -42-

1          Esso may also recover attorneys' fees in an amount to be later determined by the court

2   against both Plaintiffs—not the Sánchez Parents— and their attorney Cabrera.

3          **IT IS SO ORDERED**.

4          San Juan, Puerto Rico, this 29th day of September, 2010.

5                                        S/José Antonio Fusté
6                                        JOSE ANTONIO FUSTE
7                                        Chief U. S. District Judge